UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

GUILLERMO MANZO OCHOA,    ) CV 08-00044-SH
                                    )
                Plaintiff,    ) MEMORANDUM  DECISION
                                      ) AND ORDER
    v.                            )
                                      )
MICHAEL J. ASTRUE,              )
COMMISSIONER Social Security   )
Administration                      )
                Defendant.    )
_____ )

## I. PROCEEDINGS

Plaintiff Guillermo Ochoa filed an application for Supplemental Security

Income (SSI) benefits under Title XVI of the Social Security Act, on May 9, 2003.

The Commissioner initially denied the claim on August 26, 2003. An

Administrative Law Judge (ALJ) conducted hearings on June 22, 2004 and October 20, 2004. The ALJ issued a decision dated February 25, 2005, denying Plaintiff's claim. Subsequently, Plaintiff sought review by the Appeals Council. The Appeals Council declined review on December 6, 2005. A civil action followed, and the District Court reversed and remanded the matter on October 31, 2006. A remand hearing was held before the ALJ on September 24, 2007. The ALJ issued a decision dated October 24, 2007, again denying Plaintiff's claim. The matter then was appealed directly to the District Court, resulting in the current civil action.

The parties have consented to the jurisdiction of the undersigned Magistrate Judge. Plaintiff and Defendant filed a Joint Stipulation on November 13, 2008. Plaintiff asserts two claims of error. First, Plaintiff alleges that the ALJ erred by incorrectly evaluating his treating physicians' opinions. Second, Plaintiff alleges that the ALJ improperly evaluated his testimony of mental impairment. For the reasons shown below, the Commissioner's decision denying benefits is reversed and remanded for calculation of benefits in accordance with this Decision.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the ALJ's decision to deny benefits. The Commissioner's decision that a claimant is not disabled may be set aside when the ALJ's findings are based on legal error or are not

supported by substantial evidence in the record as a whole. <u>Schneider v. Commissioner of the SSA</u>, 223 F.3d 968, 973 (9th Cir. 2000). "Substantial evidence is more than a mere scintilla but less than a preponderance - it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

"[The Court reviews] the administrative record in its entirety to decide whether substantial evidence to support the ALJ's decision exists, weighing evidence that supports and evidence that detracts from the ALJ's determination." <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992). The Court may not affirm the ALJ's decision "simply by isolating a specific quantum of supporting evidence." <u>Hammock v. Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). "The [ALJ's] findings of fact are conclusive if supported by substantial evidence." <u>Miller v. Heckler</u>, 770 F.2d 845, 847 (9th Cir. 1985). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotations omitted).

# III. DISCUSSION

## A.   THE ALJ INCORRECTLY EVALUATED PLAINTIFF'S TREATING PHYSICIANS' OPINIONS

(1) <u>The treating physicians' opinions were supported by substantial objective evidence.</u>

In finding Plaintiff not disabled, the ALJ primarily based his mental residual functional capacity assessment on the opinion of the medical expert, Dr. Peterson. [AR 561]. Plaintiff presented the opinions of two treating physicians, Dr. May and Dr. Schwertdfger. [AR 390-93, 778-81]. The ALJ rejected the opinions of the treating physicians, stating that their opinions were not supported by the objective evidence or treatment records. [AR 561].

In <u>Orn v. Astrue</u>, the Ninth Circuit further clarified the required analysis for various physician opinions:

"The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Lester [v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)* (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Id.* (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id. at 830*, quoting *Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)*. This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).]* The ALJ must do more than offer his conclusions. He must set forth

4

his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)*; *accord Thomas, 278 F.3d at 957*; *Lester, 81 F.3d at 830-31*." <u>Orn v. Astrue</u> 495 F.3d 625, 632 (9th Cir. 2007).

Plaintiff's primary treatment facility was Hillview Mental Health Center. An initial assessment was conducted at that facility on July 26, 2002. [AR 217-221]. In the initial assessment, Plaintiff was diagnosed with major depression disorder and moderate panic disorder without agoraphobia. [AR 221]. Records show that Plaintiff continued treatment throughout 2002 and 2003 with one of the physicians at Hillview. [AR 205-12]. He was treated for depression, anxiety, and panic disorder. [AR 205-211].

Dr. Robin May-Davis, who was then Dr. May, became his treating physician at Hillview as of August 2003. [AR 204]. Her diagnoses in August 2003 were panic disorder and major depression. [AR 204]. In her medical source statement dated October 24, 2005, under the section "DSM-IV Multiaxial Evaluation," she stated "major depression, GAD, h/o panic d/o," which the Court understands to indicate major depression, generalized anxiety disorder, and history of panic disorder. [AR 390]. From August 2003 through March 2007, as his primary treating physician, Dr. May consistently diagnosed and treated Plaintiff for GAD and panic disorder, which

were frequently accompanied by major depression disorder. [AR 400-27, 714-23, 725-42, 750-52].

In her medical source opinion, when asked "would your patient have difficulty working at a regular job on a sustained basis?" Dr. May noted, "Yes." [AR 393]. She further stated that agitation is severe if Plaintiff cannot exercise several hours each day. Also, she noted significant problems with concentration and lack of focus; Plaintiff is overwhelmed easily and reports headaches if he has to think too much. [AR 393]. Additionally, in a chart describing functional limitations, for item no. 3 noting "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)," Dr. May circled "frequent." Also, for item no. 4 noting "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)," Dr. May indicated "often or twice" to "repeated (three of more)." [AR 393].

Subsequently, Dr. Don Schwerdtfger took over as Plaintiff's treating physician. In his medical source opinion dated August 24, 2007, under the section "DSM-IV Multiaxial Evaluation," he stated "major dep. d/o" and "panic d/o w/o agoraphobia." [AR 778]. In his medical source opinion, when asked "would your

patient have difficulty working at a regular job on a sustained basis?" Dr. Schwerdtfger noted, "Yes." He stated, "due to patient's mental health symptoms and cognitive impairments, patient repeatedly fails to adapt to stressful circumstances. Patient has persistent anxiety and poor concentration that limit patient's ability to make decisions, complete tasks, maintain appropriate pace, and interact w/ peers." [AR 781].

In a chart describing functional limitations, for item no. 3, noting "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)," Dr. Schwerdtfger circled "constant." [AR 781]. Also, for item no. 4, noting "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)," Dr. Schwerdtfger indicated "continual." [AR 781].

The medical expert testified at the hearing that there was a "lack of acceptable clinical and laboratory diagnostic techniques to arrive at cognitive impairment in attention, the difficulties described, and the level of impairment expressed by Dr. Schwerdtfger." [AR 562]. The medical expert also stated that the levels of impairment expressed by Dr. May and Dr. Schwerdtfger varied in degree, and noted

that Dr. Schwerdtfger  presumably  treated Plaintiff once or twice over the course of two months, and therefore more closely resembled a consultative examiner. [AR 562].

Also, the medical expert testified that he gave no weight to Dr. May's assessment that Plaintiff was markedly limited in concentration, persistence, and pace, because there were none of the commonly accepted psychological data that one would use to establish that level of limitation. [AR 562]. The medical expert stated that while Hillview may be a County clinic, it does have access to inexpensive tests for concentration and memory. He mentioned examinations such as WIMS and Cognistat. [AR 819]. The medical expert also testified that he has never worked as a physician in a County system in Los Angeles, or in California. [AR 821].

Although the suggested psychometric testing may have provided additionally helpful information, the pertinent question is whether the treating physicians' opinions, without any supplementary psychometric testing, were supported by other objective evidence such as to substantiate Plaintiff's claim of disabling mental impairment of generalized anxiety and panic disorder.

"Courts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical

impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine." Lebus v. Harris, 526 F. Supp. 56, 60 (N.D. Cal. 1981). (citations omitted). "In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devises in order to obtain objective clinical manifestations of mental illness. A strict reading of the statutory requirement that an impairment [be] 'demonstrable by medically acceptable clinical and laboratory diagnostic techniques,' 42 U.S.C. §§ 423(d) (3), 1382c(a)(3)(C), is inappropriate in the context of mental illness. Rather, when mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnoses and observations of professionals trained in the field of psychopathology." Id.

Here, both treating physicians are licensed psychiatrists working for a County mental health facility. Each of Plaintiff's visits with the treating physicians is independently documented by the facility's "M.D. Medication Evaluation / Plan," which includes the time duration and the date of service. This form documents the physician's assessment through check-boxes and by handwritten notes. Pursuant to the form, the physician assessed the following during each visit: mental status[1, 2];

_____

[1] Under "mental status," the treating physician checks "yes" or "no" for the following symptoms: hallucinations; delusional thinking; paranoid ideation; impaired judgment; oriented; suicidal ideation; homicidal ideation; normal motor; depression; anxiety; sleep disturbance; change in appetite; weight loss or gain; psychomotor retardation;

medication compliance; signs of tardive dyskinesia; side effects; response to medication/assessment; medication plan; risk of hospitalization; need for medication monitoring; impaired community functioning; recurring psychiatric history of functioning impairment; the current diagnosis; and applicable DSM codes. [AR 192-212, 383, 400-434, 714-22, 725-31, 734-42, 749, 751].

Hillview Mental Health Center also maintained a "Physician's Orders\Medication Log" as a part of Plaintiff's file, which consisted of log sheets filled in by his treating physicians. [AR 213-16, 267-70, 384-88, 435-40, 724, 732-33, 750, 752]. Plaintiff had been on a medication regimen since at least September 5, 2002. [AR 270]. These logs note the date of the physician's order, the prescribed medication's type and dosage, and the physician's signature. The logs also note

---

psychomotor agitation; normal gait. Apparently as needed, the treating physician also writes in by hand additional notes to supplement the "yes" or "no" answer checked. [AR 192-94, 196, 198, 199, 201-04, 400, 402-04, 408, 410, 412, 413, 415-17, 419, 421, 422, 424-27].

[2] The Social Security regulations explain mental status examinations as the following:

> "The mental status examination is performed in the course of a clinical interview and is often partly assessed while the history is being obtained. A comprehensive mental status examination generally includes a narrative description of your appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight." 20 C.F.R. part 404, subpart P, app. 1, § 12.00(D)(4)

10

when Plaintiff was seen by the physician, but no medication was prescribed. [AR 270].

Where disability due to mental impairment is involved, the need for longitudinal evidence is vital. 20 C.F.R. part 404, subpart P, app. 1, § 12.00(D)(2). According to the Hillview records, Plaintiff took an initial assessment examination on July 26, 2002. [AR 221]. He subsequently began a regular course of treatment at this facility, and the records show a medication prescription as early as September 5, 2002. [AR 216, 270]. The records further indicate that treatment was rendered up through April 5, 2007. [AR 750]. Over the course of Plaintiff's treatment period, records of visits and treatment, such as the "M.D. Medication Evaluation / Plan" discussed above, appear to have been consistently and reliably maintained. The treating physicians, particularly Dr. May, had the benefit of observing, assessing, and treating Plaintiff at regular intervals over this period. Dr. May's opinion alone provided a longitudinal assessment of Plaintiff's psychiatric condition. [AR 600].

According to the ALJ's Decision, the medical expert found it "significant that the majority of the treatment records from Hillview are monthly appointments for medication management which simply recount expressed symptoms and medication." [AR 561]. However, this conclusion oversimplified and discounted the value of the longitudinal history provided by the totality of the treatment records.

The Court finds that the treatment records amply support the treating physicians' opinion. Accordingly, the Court finds that the ALJ erred in rejecting the treating physicians' opinions based on a supposed lack of objective evidence. [AR 192-212, 212, 383, 400-434, 714-22, 725-31, 734-42, 749, 751; see also AR 213-16, 267-70, 384-88, 435-40, 724, 732-33, 750, 752].

 (2) The ALJ did not properly consider whether the treating physicians' opinions should be afforded controlling weight.

As discussed above, the ALJ chose to accept the opinion of the medical expert, and rejected the opinions of the two treating physicians. [AR 561]. The Ninth Circuit has clarified the importance of treating physician opinions in determining a claimant's impairment and resulting functional limitations.

As the Ninth Circuit explained in Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007):

> "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. *See 20 C.F.R. § 404.1527*. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Id. § 404.1527(d)(2)*. If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. *Id. §*

12

*404.1527(d)(2)(i)-(ii)*. Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. *Id. § 404.1527(d)(1)-(2)*.

Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id. § 404.1527(d)(3)-(6)*.

The Administration has explained *§ 404.1527* in Social Security Ruling 96-2p. That ruling provides, in relevant part:

 [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in *20 C.F.R. 404.1527* . . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. S.S.R. 96-2p at 4 (Cum. Ed. 1996), *available at 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)*." Orn v. Astrue 495 F.3d 625, 631-32 (9th Cir. 2007).

As Orn summarized, the Social Security Rulings clearly indicate that a treating physician's opinion should be entitled to controlling weight, unless the ALJ correctly finds that such opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial

13

evidence in the record. In such a case, the treating physician's opinion is not entitled to "controlling weight." Here, however, the treating doctors' opinions were supported by medically acceptable clinical techniques.

The administrative record also contains the opinions of two examining physicians, Dr. Suzanne Dupee and Dr. Stephen Simonian, which the ALJ considered and rejected. [AR 561]. Instead of relying on the treating physicians or the examining physicians, the ALJ "afforded greater weight to the assessment of [the medical expert] as the only expert who reviewed the entire file. [He] had the opportunity to consider all treating, examining, and reviewing opinions, and was there in the best position to evaluate [Plaintiff's] mental condition (20 CFR §416.927(d)(3) and (d)(6))." [AR 561]. The ALJ did not specify further why he afforded greater weight to the medical expert's opinion than those of the consultative examiners.

Notably, in evaluating Plaintiff, the consultative examiners employed clinical techniques which closely resembled the methods used by the treating physicians at Hillview. In July 2003, Dr. Suzanne Dupee, performed a "complete psychiatric evaluation" of Plaintiff. [AR 161-64]. As a part of this evaluation, she conducted a "mental status examination," which noted things such as appearance and behavior, speech, mood, affect, thought process, thought content, insight and judgment,

orientation, memory, calculating abilities, similarities, abstractions, concentration, and fund of information. Dr. Dupee then stated her diagnosis. Under the section "Diagnosis by DSM-IV," she stated "panic disorder without agoraphobia." [AR 164].

In the following sections, Dr. Dupee stated her assessment of Plaintiff's ability to work, and a prognosis. Dr. Dupee opined that Plaintiff had mild impairment in the ability to maintain concentration and attention, persistence and pace; mild to moderate impairment in the ability to adapt to the stresses common to a normal work environment, including attendance and safety; and mild impairment in the ability to maintain regular attendance in the workplace and perform work activities on a consistent basis. [AR 165]. Also, Dr. Dupee opined that Plaintiff's prognosis "is good if he continues his current treatment." [AR 165].

In June 2007, Dr. Stephen Simonian also performed a "complete psychiatric evaluation" of Plaintiff. [AR 769-76]. As a part of the evaluation, Dr. Simonian also conducted a "mental status examination," which considered almost identical criteria as the examination conducted by Dr. Dupee.[3]

---

[3] Drs. Dupee and Simonian, at the time of the respective examinations, were physicians employed at Carmel Medical Group in Burbank, CA. The criteria considered during the two evaluations, as well as the format of the summary reports of the "complete psychiatric evaluation" performed at the Carmel Medical facility, are nearly identical.

Dr. Simonian diagnosed Plaintiff with "panic disorder, in partial remission." [AR 772]. Under the section "functional assessment," among other things, Dr. Simonian opined that Plaintiff is able to maintain concentration and attention for a period of time; that Plaintiff is able to adapt to the stresses common to a normal work environment; and that Plaintiff is able to maintain regular attendance in the work place and perform work activities on a consistent basis. [AR 772].

The examining physicians, who were board-certified psychiatrists, conducted their evaluations of Plaintiff employing similar clinical techniques as the treating physicians, and both Dr. Dupee and Dr. Simonian diagnosed Plaintiff with having a panic disorder. [AR 161-66, 769-76]. In their professional capacity, they observed Plaintiff, asked him questions, and analyzed his answers. They did not conduct any psychometric testing, nor did they suggest that they needed to do so before they could make a determination as to Plaintiff's impairment and functional limitations.

The ALJ primarily relied on the opinion of the medical expert, Dr. Peterson, in forming the mental residual functional capacity assessment. [AR 561]. Dr. Peterson lacked the opportunity to examine Plaintiff, and had only the benefit of reviewing the entire file. Dr. Peterson's opinion regarding Plaintiff's impairment was amphetamine abuse, and in the alternative, panic disorder without agoraphobia. [AR 804]. The issue of amphetamine abuse is discussed in another section below.

16

Setting aside the issue of amphetamine abuse for a moment, Dr. Peterson also assessed Plaintiff's impairment as panic disorder.

It is notable that the Court previously remanded Plaintiff's claim because the Appeals Council improperly rejected Dr. May's medical source opinion, and had erroneously found that her opinion was not supported by objective mental status findings. [AR 600]. The ALJ on remand offered similar findings as the Appeals Council had, by mischaracterizing the Hillview treatment records and unduly emphasizing the medical expert's opinion about the availability of psychometric evaluations. [AR 561-62]. Also, the ALJ relied on the medical expert's testimony that Plaintiff showed an improvement in 2004, despite subsequent treatment records and treating physicians' opinions which indicated otherwise. [AR 561].

Plaintiff correctly argues that the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinions of either examining physicians or treating physicians. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996). In the hierarchy of medical opinions as structured by the Social Security Rulings, a nonexamining physician's opinion, such as that of the medical expert here, ranks lower than the opinions of the treating and examining physicians. Lester, supra, Id. When substantial evidence that supports increased reliance on a nonexamining physician's opinion outweighs the substantial evidence

supporting the treating physician's opinion, the shift of controlling weight to the nonexamining physician's opinion is justified. Viewing the record here as a whole, such shift of controlling weight away from the treating physicians' opinions was not justified.

Based on the foregoing discussion, the Court finds that the ALJ erred in evaluating Plaintiff's treating physicians' opinions, and finds that they were entitled to controlling weight, since there was no other substantially different clinical evidence.

**B. THE ALJ INCORRECTLY FOUND PLAINTIFF NOT CREDIBLE AS TO HIS TESTIMONY OF MENTAL IMPAIRMENT**

In the Second Decision, the ALJ stated five grounds for finding Plaintiff not credible.

In this Circuit, unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing. General findings are insufficient. The ALJ must identify with specificity what testimony is not credible and what evidence undermines the claimant's complaints. Morgan v. Commissioner of SSA, 169 F.3d 595, 599 (9th Cir. 1999)

If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may not engage in second-guessing. Thomas v. Barnhart, 278 F.3d

947, 959 (9th Cir. 2002). The substantial evidence standard is somewhere between a scintilla and a preponderance. <u>Sandgathe v. Chater</u> 108 F.3d 978, 980 (9th Cir. 1996). Under this standard, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).

In addition, the Ninth Circuit has specified supplemental legal standards for various sub-categories of criteria within the overall structure of credibility assessment. Applying these bases, each of the ALJ's conclusions is discussed below.

**(1) The ALJ incorrectly found that Plaintiff's credibility is reduced by the lack of objective medical evidence to substantiate his claims.**

The ALJ found Plaintiff to be not credible based on the supposed lack of objective medical evidence to substantiate his claims, as discussed above. In his Decision, the ALJ moreover noted that with the exception of the treating physicians' opinions, which he rejected, "no examining or reviewing physician has rendered an opinion fully supporting the claimant's allegations. In fact, several find him to be much more capable than he claims." [AR 563]. The ALJ viewed the examining physicians' opinions as being different from those of the treating physicians, especially with regard to the physicians' opinions about Plaintiff's functional

19

limitations and capabilities in light of his mental impairments. The ALJ, relying on the non-treating physicians' opinions, found Plaintiff to be not credible.

However, when the ALJ makes an assessment of credibility, his decision must be based on substantial evidence. In the Ninth Circuit, specifically in the context of comparison between treating and examining physicians' opinions, when an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). As the Ninth Circuit explained in Murray v. Heckler, 722 F.2d 499, 501-02 (9th Cir. 1983), "In this case, … the *findings* of the non-treating physician were the same as those of the treating physician. It was his *conclusions* that differed. . . . If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Orn, supra, Id.

By contrast, when an examining physician provides "independent clinical findings that differ from the findings of the treating physician," such findings are "substantial evidence." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); accord, Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1985).

"Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician which are supported by substantial evidence, (see Allen, 749 F.2d at 579), or (2) findings based on objective medical tests that the treating physician has not herself considered, (see Andrews, 53 F.3d at 1041)." Orn, 495 F.3d at 632.

In light of the precedents set forth above, to determine whether the examining physicians' conclusions constitute "substantial evidence," the Court must resolve (1) whether the examining physicians relied on the same clinical findings as the treating physicians, and, if so, whether the physicians' conclusions differed; and (2) whether the examining physicians provided any independent clinical findings that differed from the findings of the treating physicians.

First, the clinical findings and conclusions of the treating and examining physicians must be considered. As discussed above, the two examining physicians both diagnosed Plaintiff with having a panic disorder, which is one of Plaintiff's disorders diagnosed by both of his treating physicians. As discussed in Orn, when an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." Here, all four treating and examining physicians diagnosed Plaintiff with a panic disorder. Although the treating and

examining physicians differed in their conclusions as to his functional limitations, the clinical findings of diagnosis are the same. Therefore, the examining physicians' opinions regarding Plaintiff's functional limitations cannot constitute substantial evidence, contradicting the treating physicians.

Second, on the issue of whether the examining physicians provided any independent clinical findings that differ from the findings of the treating physicians, the record indicates that Dr. Dupee and Dr. Simonian each evaluated Plaintiff during the course of a single session. The records do not show that other exams were conducted, other than the complete psychiatric assessment. Dr. Simonian's evaluation includes a three-page check-box/fill-in medical source statement. However, this statement discusses Dr. Simonian's assessment of Plaintiff's functional abilities as affected by the impairment, and may be characterized as part of the conclusion, rather than diagnosing an impairment. The Court concludes that the examining physicians did not provide independent clinical findings differing from the findings of the two treating physicians. Therefore, the examining physicians' conclusions are not "substantial evidence," and the ALJ erred in relying on them to find Plaintiff not credible.

**(2) The ALJ incorrectly found that Plaintiff's credibility is reduced by his inconsistent compliance with treatment.**

22

The ALJ found that Plaintiff refused to change his medications when recommended by his treating physicians, and that he missed "numerous" appointments. [AR 563]. Based on these, the ALJ found that Plaintiff is not credible. The ALJ found this to be significant, because Plaintiff's mental disorder is a condition readily treatable with medications. [AR 563].

An ALJ may find that a claimant's refusal of a recommended course of treatment, or his failure to take a prescribed medication that would alleviate the alleged disabling symptoms, supports finding a claimant not credible. 20 CFR § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 CFR 303.1530(b) and 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled.")

"'To determine whether substantial evidence supports the decision of the Administrative Law Judge (ALJ), appellate courts review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. Where the evidence is susceptible to more than one rational interpretation,' we must uphold the Commissioner's decision." Sandgathe v. Chater 108 F.3d 978, 980 (9th Cir. 1996) (citing Andrews v. Shalala, 53 F.3d 1035, 1039-40).

Here, the Court must consider whether Plaintiff had a "good reason" for refusing to change medications, despite a treating physician's recommendation. To clarify, the record indicates that until Plaintiff refused to change medications in late 2006, he complied with medication changes when instructed. As Plaintiff points out in the Joint Stipulation:

> "As of December 6, 2002, Neurotin was added to Celexa. [AR 209]. His medication was changed to Lexapro in June 2003; however, by September 2003, other medications that he was taking were interacting with the Lexapro to cause dizziness which resulted in decreased Lexapro and Buspar being added. [AR 201-03, 205]. His insurance would not pay for Buspar so Klonopin was added in late 2003. [AR 198-200]. In May 2004, he was told to stop taking all psychiatric medications due to his stomach issues. [AR 252]. Thereafter, he remained on medications yet was more cautious in changing them though he was not specifically refusing. [AR 739, 741]. In January 2006, he changed medications to Librax and Zoloft. [AR 736]. By February 2006, it is noted that he could not tolerate Librax as it made him more agitated. [AR 731]. He then started taking Seroquel. [AR 726, 727]."

The record indicates three occasions on which Plaintiff refused to change medications: the first in November 2006, the second in March 2007, and the third in April 2007. [AR 718, 749, 751]. Plaintiff is an individual with a continuous history of following a regular medication regimen for several years, prior to his first refusal noted in the record. He changed medications as recommended throughout the course of treatment at Hillview. Various treatment records, particularly throughout 2006 and the early part of 2007, consistently indicate that Plaintiff was "medication compliant." [AR 714-15, 717-18, 720, 722].

24

Plaintiff had continually denied the use of amphetamines or other illicit drugs throughout the entire history of treatment. As Plaintiff explains in the Joint Stipulation, there was a period between late 2006 and the earlier part of 2007, during which he was faced with a drug test result that he believed to be a false positive. [Joint Stipulation 18, 19]. Plaintiff argues that the refusal to change medications was limited to this period of uncertainty, and that the issue was resolved to the treating physician's satisfaction. [Joint Stipulation 18]. The record indicates that Plaintiff was asked about potential drug use on two of the three occasions he refused to change medications. [AR 749, 751].

Plaintiff's actions had a specific purpose during a particular point in his treatment history, which was a strong reason for refusing to change medications. It is difficult to imagine what more Plaintiff could have done to prove his *lack* of illicit drug use, other than offer another sample for testing, which he did, or keep the medication variables constant by refusing change until the issue of the false positive could be resolved. [AR 749]. It should be noted that Plaintiff refused to change medications, but did not refuse to take medication altogether. In light of the record, the ALJ's assessment of Plaintiff's credibility based on his refusal to change medications, as discussed above, is not based on substantial evidence, and is error.

As for Plaintiff's missed appointments, the Court agrees with Plaintiff that he did the best that he could, in spite of his impairment. Although there are numerous occasions of missed appointments throughout the treatment history, most of these were timely rescheduled. [Joint Stipulation 17; AR 194-95, 199-200, 197, 258, 253-54, 715-16, 728-30, 731, 734-35, 736-37, 739-40, 741-42]. Over a six-year treatment record, Plaintiff entirely forgot an appointment on only five occasions. [Joint Stipulation 17; AR 206, 248, 451, 405, 719, 721]. Taken together with the Plaintiff's reasoned refusal to change medications, this does not constitute substantial evidence upon which the ALJ would have found Plaintiff not credible.

**(3) The ALJ incorrectly found that Plaintiff's credibility is reduced by a poor work record.**

The ALJ found that Plaintiff is not credible based on his poor work record over the past fourteen years. Also, the ALJ found that Plaintiff is not credible because he has shown little propensity to work, even prior to his alleged disability onset date of January 1, 1999.

Unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing. General findings are insufficient. The ALJ must identify with specificity what testimony is not credible and what evidence undermines the

26

claimant's complaints. <u>Morgan v. Commissioner of SSA,</u> 169 F.3d 595 (9th Cir. 1999); <u>Lester v. Chater</u> 81 F.3d 821 (9th Cir. 1995).

Plaintiff argues that he had a strong work record until 1991. Plaintiff stopped working because he could not perform his job due to stress and depression. [AR 522]. He also worked for four months in 1997 when his medication was more effective. [AR 525]. Several treatment notes mention Plaintiff's interest in work. In July 2006, Plaintiff requested job information, and was considering vocational rehab. [AR 722]. In January and February of 2007, records note "odd jobs" and "odd jobs off and on." [AR 714, 715].

Plaintiff testified that his main problem is concentration, due to his anxiety. He can concentrate on simple things, but then gets a headache. [AR 525-26]. The nature of his impairment is the inability to focus, and to finish a given task without experiencing a disabling amount of anxiety.

The ALJ has not provided clear and convincing reasons for rejecting Plaintiff's testimony based on a showing of little propensity to work and a poor work history, when the evidence indicates that Plaintiff's impairment precludes any significant attempts to work, and, moreover, that Plaintiff has sporadically attempted to work.

**(4) The ALJ incorrectly found that Plaintiff's credibility is reduced by a single positive v-tox.**

The ALJ found that the Plaintiff is not credible due to an apparent inconsistency in the record regarding Plaintiff's positive v-tox results. In his decision the ALJ stated, "[T]he claimant inconsistently asserted that he did not test positive two times for amphetamines as stated by his treating psychiatrist. Indeed, this psychiatrist continually stated that the claimant denied and minimized his drug use. (Exhibit 24F at 4). Indeed, these inconsistencies further erode the claimant's credibility." [AR 563].

The ALJ's decision to deny benefits must be supported by substantial evidence, and be based on the application of correct legal standards. Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1996).

Plaintiff has consistently denied that he used any illicit drugs. If there is any inconsistency in the record regarding drug use, it is between Plaintiff's denial and one positive test result. There are three records in evidence which discuss V-tox results; however, among these, only one positive v-tox is ascertainable, which occurred in April 2007.

First, there are the results of a blood test dated June 7, 2006. [AR 723]. The tests ordered include glucose, lipid panel, drug screen/thc-urine, alcohol (ethanol), urine, and TSH (ultra sensitive). In the left column, it states the substance tested for, and in the right, it states the results measured. These measurements have been cut-off, or otherwise improperly scanned, and are not legible. All that can be inferred from the category "phetamine/methamph" on the left, is that the test searched for such a substance. The mere fact that the drug test included a search for illicit substances in the sample is inconclusive as to whether there actually were illicit substances in the sample.

Second, the treatment record from March 6, 2007 mentions that Plaintiff continues to "deny amph +2." [AR 751]. It also states that Plaintiff "refuses med change." [AR 751]. It can be reasonably inferred that Plaintiff was asked during this session about any amphetamine use, and that he denied any such use. The treatment record does not mention whether additional testing was conducted prior to or after this session, nor that any results were specifically discussed.

Third, the treatment record from April 5, 2007 states that Plaintiff "denies drug use despite + meth on V tox. Willing to leave another test today. States 'so-so' but unwilling to change meds." Then it continues, "V tox today" and notes

instructions to refill medication as prescribed and follow up in 4 to 6 weeks. [AR 749].

The treatment records from March 6 and April 5, 2007 are a part of Exhibit 24F. The ALJ did not specify in his Decision which records he believed indicated positive test results. The exact nature of the results he reviewed, and the resulting inconsistency, if any, are unclear. Although the treating record states that Plaintiff "is minimizing and denying concerns re: drug use," one discussion of such concerns does not by itself substantiate the broad claim that Plaintiff is an illicit drug user in denial[4]. [AR 751].

Based on a review of the record, one occasion of a positive test result that was possibly falsely positive, coupled with Plaintiff's strong and consistent denial of drug use and his offer to undergo another test, does not constitute a base of substantial evidence on which the ALJ may rely to find Plaintiff not credible.

---

[4] Taking into consideration the record as a whole, Plaintiff has been found to have GERD, and has been treating his GI problems with Zantac for several years. [AR 144-45, 209, 252, 278, 299, 319, 454, 666-67, 755, 801]. As Plaintiff explained in the Joint Stipulation, Zantac (also known as Ranitidine) is known to cause false positives on v-tox exams. [Joint Stipulation 19].

See National Institute of Health  (http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601106.html) and the College of American Pathologists (http://www.cap.org. "False-Positive Urine Drug Screens: What Clinicians Should Know and When the Laboratory Should Be Consulted"). [Joint Stipulation 19].

**(5) The ALJ incorrectly found that Plaintiff is not credible based on his finding that Plaintiff's daily activities are not consistent with his alleged impairment.**

The ALJ found that Plaintiff is not credible based on a review of his daily activities. The ALJ may consider the Plaintiff's daily activities as a part of the assessment of credibility. "With respect to the claimant's daily activities, the ALJ may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting." Smolen v. Chater 80 F.3d 1273, 1284 fn.7 (9th Cir. 1996). "[H]owever, this line of reasoning has its limits. The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." Smolen, *supra*, Id.

Here, the ALJ found that Plaintiff's "activities of daily living are not consistent with the alleged [...] impairment." [AR 563]. Specifically, the ALJ stated:

"The claimant's activities tend to show that the claimant does have the ability to perform work, if motivated to do so. Specifically, the claimant admitted that he exercises five hours per day to reduce his panic attacks by walking, hiking, and riding his bike (Exhibits 23F at 26 and 29 and 1E). Further, he stated that he takes his son and daughter to and from school, he cleans the kitchen, he shops, he attends church, and he does yard work (Testimony and Exhibits 1E and 10E). When, as here, the claimant is able to

31

spend a substantial part of the day in activities involving the performance of functions readily transferable to competitive work, the Administrative Law Judge is entitled to afford little weight to allegations of disabling pain.

The Administrative Law Judge points out that, in citing this as a credibility factor, he is not saying that the claimant's activities, by themselves, necessarily equate with work activity or show the ability to engage in work. The ability to engage in some normal daily activities does not prove that one is able to perform competitive work on a regular and continuous basis.

Rather, the claimant's activities suggest that the claimant has better physical and mental capabilities than he has stated in his testimony and written statements. This, in turn, indicates that the claimant has not been completely frank, and makes the Administrative Law Judge cautious about fully accepting the claims advanced." [AR 563-64].

Plaintiff testified that he is able to perform daily activities as long as he is able to relieve the anxiety and/or panic he feels while he is doing them. [AR 792, 793, 803, 804]. Plaintiff testified that he stops in the middle of doing things and proceeds to exercise when he feels his symptoms increasing, because varying levels of intense physical activity relieves his symptoms and onset of panic attacks. [AR 531, 532, 533, 792, 793, 795, 796]. Plaintiff's treating physician noted that he exercised "3-5 hours a day to relieve tension, despite various med changes." [AR 391]. Plaintiff testified that on occasion he exercises for five hours or more. [AR 803].

As the ALJ points out, the ability to engage in some normal daily activities does not prove that one is able to perform competitive work on a regular and continuous basis. The law does not require that a claimant be "utterly incapacitated"

32

to be found disabled. Plaintiff's daily activities as he described them are not readily transferable to a competitive work environment, since his performance of daily activities requires constant and prolonged periods of exercise. Presumably, any work setting of substantially gainful activity requires a continuous pace of productive output. Plaintiff's mental impairment precludes such a constant stream of work effort.

Plaintiff is not asserting that he is physically incapable of doing the daily activities in which he normally engages. Plaintiff alleges that his anxiety and lack of concentration, which impair his mental inability to control anxiety levels and maintain focus, are part of the mental disability that prevents him from otherwise living and working as a nondisabled person. The ALJ has considered Plaintiff's daily activities to find him not credible, without taking into consideration the degree of exercise required for Plaintiff to accomplish even these tasks. Therefore, the ALJ has erred.

## C. THE APPROPRIATE REMEDY IS REVERSAL FOR PAYMENT OF BENEFITS

The appropriate remedy must be considered based on the Court's determination on the issues above.  The Court finds that the ALJ has improperly

rejected the treating physicians' opinions, and improperly found Plaintiff to be not credible.

In this Circuit, under Harman v. Apfel, 211 F.3d 1172 (9th Cir. 2000), cert. denied, 531 U.S. 1038, 121 S. Ct. 628, 148 L. Ed. 2d 537, improperly rejected medical opinion evidence should be credited and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Harman at 1178.

Here, the first prong of the Harman test is met, as the Court has discussed above the validity of the treating physicians' opinions as supported by objective evidence in the record, and the insufficiency of the ALJ's reasons for finding these opinions unsupported.

The second prong is also met, as there are no outstanding issues that must be resolved before a determination of disability can be made. Factually, the record amply contains documentation that evidences Plaintiff's impairment and functional limitations. The ALJ's second decision included a full Five-Step analysis. A

vocational expert ("VE") testified at the second hearing. It appears that no factual development of the record is necessary.

Finally, the third prong is also met. In response to a hypothetical presented by the ALJ, the VE testified that Plaintiff would not be able to return to his previous work. [AR 824]. The VE testified that alternatively, Plaintiff would be able to perform work at a level of medium, unskilled SVP of 2. [AR 825].

Plaintiff's attorney then questioned the VE. [AR 825-26]. The transcript excerpt is as follows:

Q:    Okay. If an individual had frequent deficiencies of concentration, persistence, and pace, would that person be able to perform any of the work that you named?

A:    No, if that occurs on a consistent basis.

ALJ:  Would there be any work that such individual could perform?

A:    No.

Q:    If an individual had often or repeated episodes of decompensation deterioration, would that person be able to perform any of the work that you named?

A:    No.

Q:    Or any work in the national economy?

A:    No.

In their medical source opinions, Plaintiff's treating physicians noted that as a result of his mental impairments, he would suffer frequent to constant deficiencies of concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner. [AR 393, 781]. Also, the treating physicians noted that Plaintiff

35

would suffer often or repeated to continual episodes of deterioration or decompensation in work or work-like settings. [AR 393, 781]. The treating physicians' opinions, if properly credited, required the ALJ to find the claimant disabled. Their assessment of Plaintiff's functional limitation renders him unable to work at any job in the national economy according to the VE's testimony. Therefore, the <u>Harman</u> holding directs reversal and an award of benefits of the present case.

### III. ORDER

For the foregoing reasons, the decision of the Commissioner is reversed and remanded for calculation of benefits in accordance with this Decision.

Date: <u>June 22, 2009</u>

/ s /

_____

STEPHEN J. HILLMAN
UNITED STATES MAGISTRATE JUDGE